**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MICHAEL DEION TRAMMELL,** | § | |
| **TDCJ No. 02145063** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **A-20-CV-127-RP** |
| | § | |
| **BOBBY LUMPKIN,[1]  Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**ORDER**

Before the Court are Petitioner Michael Deion Trammell's counseled Petition for Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) and Respondent's Response (ECF No.

7). Having reviewed the record and pleadings submitted by both parties, the Court concludes

Petitioner's federal habeas corpus petition should be denied under the standards prescribed by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

**I. Background**

In June 2015, Petitioner was charged by indictment with three counts of aggravated sexual

assault of a child, three counts of indecency with a child by contact, and two counts of indecency

with a child by exposure. (ECF No. 8-5 at 28-30.) In May 2017, a jury convicted Petitioner of one

count of aggravated sexual assault of a child and two counts of indecency with a child by exposure;

the jury sentenced Petitioner to thirty years imprisonment. *State v. Trammell*, No.

---

[1] The previous named respondent in this action was Lorie Davis. Bobby Lumpkin succeeded Ms. Davis as the Director of the Texas Department of Criminal Justice, Correctional Institutions Division and is automatically substituted as a party. FED. R. CIV. P. 25(d).

D-1-DC-15-600053 (299th Dist. Ct., Travis Cnty., Tex. May 22, 2017.) (ECF No. 8-10 at 7-13.)

The following is a brief summary of the factual allegations against Petitioner, as provided by his

habeas counsel:

> [T]he State introduced evidence of six extraneous incidents of sexual abuse, beginning with an incident that allegedly occurred when the complainant was three years old. The following summarizes the seven sexual-abuse allegations that the State developed through the testimony of the complainant, the forensic interviewer (Grace Yeager), and the complainant's mother (Jennifer Aranda):
>
> (1) When the complainant was three-years-old, Petitioner allegedly rubbed his penis against the outside of the complainant's vagina. Based on Petitioner's date of birth (9/22/94) and the complainant's date of birth (12/01/1998), Petitioner was about seven-years-old at the time of this alleged conduct.
>
> (2) When the complainant was in the third grade, Petitioner allegedly grabbed her hand and made her touch his penis while they were in a closet during a game of hide-and-seek.
>
> (3) While playing video games with Petitioner and his brother (Devin) at a birthday gathering, Petitioner allegedly pulled down [the complainant's] pants and touched her vagina after Devin left the room. The complainant could not remember exactly when this incident occurred, but the context of the testimony revealed that it happened before the complainant was in the "second or third grade."
>
> (4) When the complainant was in the second or third grade, she liked to make pillow-and-sheet forts in Devin and Petitioner's bedroom. After Devin stepped out of the room, Petitioner allegedly pulled down both [his and the complainant's] pants and forced [the complainant] to touch his penis.
>
> (5) When the complainant was in the fourth grade, an incident allegedly occurred when she was playing Guitar Hero (a video game) with Devin and Petitioner. After Devin dozed off, Petitioner pulled down [the complainant's] pants, grabbed her head, and made her put her mouth on his penis.
>
> (6) The complainant testified that when she was ten-years-old (and Petitioner was 14-years-old), Petitioner exposed himself to her in a living-room fort. According to the complainant, Devin witnessed this incident and told Petitioner to leave her alone.
>
> (7) When the complainant was 13-years-old, she visited Petitioner and his family at their home in Pflugerville. During this visit, Petitioner allegedly locked her in his room, got on top of her, pulled down both of their shorts, and penetrated her vagina

with his penis. Based on the complainant's date of birth and her testimony that this incident occurred when she was entering the eighth grade, this incident was the one for which Petitioner was indicted.

(ECF No. 1-1 at 5-7.)

Following his conviction, Petitioner filed a notice of appeal, but then moved to dismiss the appeal, which was granted. *Trammell v. State*, No. 01-17-00542-CR, 2017 WL 6759196 (Tex. App.—Houston, Dec. 28, 2017, no pet.) Petitioner did not file a writ of certiorari in the United States Supreme Court. (ECF No. 1 at 3.)

On October 30, 2018, Petitioner filed a counseled state habeas corpus application, listing the following four grounds of relief:

1. Trial counsel provided ineffective assistance by waiving Petitioner's right to an evidentiary hearing under Article 38.37 of the Texas Code of Criminal Procedure to determine whether there was sufficient evidence to believe beyond a reasonable doubt that Petitioner committed six extraneous offenses;

2. Trial counsel provided ineffective assistance when counsel failed to secure the appearance of a favorable defense witness at trial and then falsely promised the jury in opening statements that they would hear from this witness;

3. Trial counsel rendered ineffective assistance by failing to interview three key witnesses, Dr. Carol Mitchum, Dr. F. Ada Ifesinachukwu, and Carlyn Bradbury, who would have provided favorable, material testimony; and

4. Trial counsel rendered ineffective assistance at the punishment phase when he failed to present any mitigating evidence about Petitioner's mental-health disorders.

(ECF No. 8-22 at 17-34.) On November 15, 2018, the state habeas court ordered Petitioner's trial counsel, Mr. Malcolm Nettles, to submit an affidavit addressing these issues within thirty days. (*Id.* at 137-38.) In February 2019, after Mr. Nettles failed to respond to the court's order, Petitioner filed a motion for an evidentiary hearing; Mr. Nettles filed his affidavit on March 29, 2019. (*Id.* at 139-43, 145-48.) Petitioner then filed a second motion for an evidentiary hearing, arguing that Mr. Nettles's first affidavit was grossly insufficient. (*Id.* at 150-61.) On May 6, 2019, the state habeas

3

court ordered Mr. Nettles to file a second affidavit addressing, inter alia, whether he rendered ineffective assistance by waiving Petitioner's right to an evidentiary hearing under Texas Code of Criminal Procedure Art. 38.37. (*Id.* at 163.) On June 3, 2019, Mr. Nettles filed a supplemental affidavit, but it did not respond to this issue. (ECF No. 8-45 at 16-21.)

The state habeas court held an evidentiary hearing on August 26, 2019; Mr. Nettles did not appear and the State said they believed he was retired and living outside the country. (ECF No. 8-44 at 15.) On October 23, 2019, the state habeas court adopted the State's Proposed Findings of Fact and Conclusions of Law and recommended denying Petitioner's application for a writ of habeas corpus. (ECF No. 8-22 at 190.) On November 20, 2019, the Texas Court of Criminal Appeals (TCCA) denied Petitioner's application without written order on the findings of the trial court. (ECF No. 8-23.) *Ex parte Trammell*, No. WR-89,800-01.

On February 4, 2020, Petitioner filed the instant federal habeas petition through counsel, raising the first three claims from his state habeas application. (ECF No. 1.) On May 4, 2020, Respondent filed an answer. (ECF No. 7.)

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a

4

complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011). "If this standard is difficult to meet—and it is—that is because it was meant to be." *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (quoting *Burt v. Titlow*, 571 U.S. 12, 20 (2013)).

### III. Analysis

### A. Ineffective Assistance of Counsel

All three of Petitioner's federal habeas claims are based on allegations that his trial attorney provided ineffective assistance of counsel. The Sixth Amendment to the United States

5

Constitution guarantees citizens the assistance of counsel in defending against criminal prosecutions. U.S. CONST. amend VI. Sixth Amendment claims concerning allegedly ineffective assistance of counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). When the state court has adjudicated the claims on the merits, a federal court must review a petitioner's claims under the "doubly

deferential" standards of both *Strickland* and Section 2254(d). *See Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.

### 1. Failure to hold evidentiary hearing

In Petitioner's first claim, he argues Mr. Nettles provided ineffective assistance when he failed to object to the admission of six extraneous offenses of prior sexual contact between Petitioner and the complainant which were then admitted without the trial court holding an evidentiary hearing pursuant to Texas Code of Criminal Procedure Article 38.37[2] and Texas Rule of Evidence 104(b)[3]. Specifically, Petitioner argues that Article 38.37 requires the trial court to hold a hearing to determine if there is sufficient evidence for the jury to believe beyond a reasonable doubt that Petitioner committed the extraneous offenses, and that, by failing to object when there was no hearing, Mr. Nettles's performance was deficient. Respondent argues that, because Petitioner's claim is based on an interpretation of state law, this court is "bound by those state court determinations" and that the "highest state court's interpretation of its own law is binding on the district court below." (ECF No. 7 at 11-12.)

The trial record shows the following. On the first day of trial, and outside the presence of the jury, the court held an outcry hearing. After the hearing concluded and before the jury was brought in, the following exchange occurred:

---

[2] Under article 38.37, "evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child." TEX. CODE CRIM. PROC. ANN. art. 38.37 § 1(b) (West 2019).
[3] Rule 104(b) states "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." TEX. R. EVID. 104(b).

> Prosecutor: And to be clear for the record, we heard from Ms. Yeager today about some instances that are not charged within the indictment, but are part of a continuing course of conduct, and I believe would be admissible based on those, but I also believe it would be admissible under 38.37, and I wanted to make sure that before we called the victim to the stand that everything that we have been speaking of during this continuing course of conduct would be relevant and admissible at this point in time.

> The Court: Any objection to that?

> Mr. Nettles: I don't have any problem with that.

(ECF No. 8-15 at 61-62.) At the end of the trial, the judge gave the following instructions to the jury regarding extraneous offenses:

> You may have heard evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense. This evidence has been admitted for its bearing, if any, on relevant matters including:
> (1) The state of mind of the defendant and the child; and
> (2) The previous and subsequent relationship between the defendant and the child.

> You cannot consider the testimony relating to any of the crimes, wrongs or acts unless you find and believe beyond a reasonable doubt that the defendant committed these acts, if any.

(ECF No. 8-7 at 78-79.)

In his state habeas application, Petitioner argued that by failing to object to the prosecutor's statement that the extraneous offenses were admissible, Mr. Nettles waived Petitioner's right to an evidentiary hearing under Article 38.37. This in turn prejudiced Petitioner because it allowed the State to argue that the charged incident represented the culmination of years of sexual abuse. (ECF No. 8-22 at 44-49.)

In Mr. Nettles's first affidavit, he responded to this claim as follows:

> During the representation of a defendant many decisions are made regarding the wisdom of having an evidentiary hearing. Often such hearings prepare witnesses for the prosecution and offer an opportunity to practice their testimony. Factors in making such a decision frequently include getting discovery which is not

forthcoming due to the inability of the State to provide materials or testimony requested by the Defense. Such was not the case in this matter. The State was open with the information provided and provided discovery contemporaneous with any request made. In fact, Mary Farrington interviewed at least one witness who had been Defendant's therapist at the request of Defendant. Subsequent discussion determined the witness was not credible. Judge Sage inquired at every hearing as to the needs of the Defendant and stood ready to have any evidentiary hearing necessary should that need arise. What she would not permit is the arbitrary use of the Court's time for the deposition of witnesses. It was the trial strategy of counsel with the consent [of] the Defendant to waive such hearings.

(ECF No. 8-22 at 146.) The state habeas court ordered Mr. Nettles to file a second affidavit on this

issue but the affidavit he submitted was not responsive. (ECF No. 8-45 at 16-21.)

At the evidentiary hearing, Petitioner testified that, contrary to Mr. Nettles's affidavit, he

and Mr. Nettles never discussed waiving the Article 38.37 hearing. (ECF No. 8-44 at 48-49.) The

trial prosecutor, Ms. Abby Fowler, testified that the majority of the pretrial hearing was devoted to

outcry witnesses and that, had Mr. Nettles objected to the extraneous offense evidence, she would

have argued it was admissible as part of a continuing course of conduct because "but for the fact

that [Petitioner] had been a juvenile at the time [of the extraneous offenses], he would have been

charged with all of it in one continuing course of conduct indictment." (*Id.* at 83-84.) Ms. Fowler

also testified that she believed "there was some strategy in [Mr. Nettles's failure to object]

because, as the trial moved on, I think his—one of his big arguments was that some of this conduct

from [when the Petitioner] was much younger made [the complainant] totally unbelievable. (*Id.* at

92.)

At the end of the hearing, the court noted that, although Mr. Nettles was not present, "I was

[at the trial], and I watched him try this case, and I watched his strategy, which was clear." (*Id.* at

115.) With regard to the Article 38.37 hearing, the court speculated that, had Mr. Nettles objected

and requested a hearing,

here's exactly what would have happened. [Mr. Nettles] would have taken [the complainant] outside the presence of the jury, and she would have testified to what then she ultimately testified [to] before the jury. I would have made a finding based on—I know what she testified to—that it was—the jury could find it provable beyond a reasonable doubt.

My instructions were very clear in my final instructions to the jury. That in order to consider any of those offenses, the jury must first find them provable beyond a reasonable doubt, so [] they knew that. So whether or not a 38.37 hearing was held would not have made a difference and would not have prejudiced the defense. 38.37 is a very special statute that applies in these type of cases for very special reasons.

And so both for strategy reasons, where it was clear that Mr. Nettles wanted those prior incidences that she was three years old, he used those prior incidences. So I think—I'm not saying that that was his strategy, but I'm not saying that, looking back on it, you cannot—you can say there's no way that that could have been a strategic defense.

(*Id.* at 115-16.) The court recommended denying the claim, and made the following findings of

fact and conclusions of law:

16. ADA Fowler prepared a 404(b) notice alleging extraneous conduct, which she had learned about through police reports, CPS records, and speaking with different people involved in her investigation.

17. ADA Fowler felt some of the extraneous conduct was admissible pursuant to Article 38.37 of the Texas Code of Criminal Procedure, in that it involved a continuing course of sexual conduct against the same complaining witness as the instant indictment.

18. The trial court conducted a hearing on May 16, 2017, that addressed the admissibility of outcry witness testimony.

19. At that proceeding, ADA Fowler raised the issue of the admissibility of extraneous conduct she believed was admissible under Article 38.37 in anticipation of a potential objection at trial.

20. Mr. Nettles indicated at that hearing there was no objection to the evidence being referred to by the State.

21. The extraneous conduct evidence involving instances of sexual conduct with the same complaining witness was relevant and admissible.

22. Mr. Nettles argued at trial that the complaining witness's allegations began at such a young age that she must have been coached by a biased adult to have false memories, and that her testimony about those events was totally unbelievable.

23. The defense strategy of impeaching the complaining witness with the implausibility of such early memories necessarily involved waiving objection to the extraneous offenses.

24. Applicant has failed to show that his attorney's waiver of objection to extraneous conduct discussed at the 38.37 hearing was outside the zone of reasonable representation.

(ECF No. 8-22 at 173-74.) The TCCA denied the claim.

The Court must first address Respondent's argument that this Court is bound by the state court's determination because it decided a matter of state law. This is not correct. The state court decided a constitutional claim—ineffective assistance of counsel—and not a state-law claim. Further, while Respondent's Response repeatedly refers to "AEDPA's re-litigation bar," the Court cautions against using this misleading phrase: while the AEDPA requires federal courts to substantially defer to a state court's merits adjudication of state habeas corpus petitions, as noted above, it stops short of imposing a complete bar on federal court re-litigation of unsuccessful state habeas actions. *See Richter*, 562 U.S. at 102.

As to the merits, this Court's review of Petitioner's claim is guided by the AEDPA, under which Petitioner must show that the state habeas court's determination was an unreasonable application of *Strickland*. The Court concludes it was not. First, the state court found that Mr. Nettles had a plausible trial strategy in not objecting to the admission of the extraneous offenses: that is, by having the complainant testify to memories of sexual abuse that occurred when she was three-years-old, her credibility would be impeached. Trial counsel has broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (the Supreme Court has emphasized counsel has "wide latitude in deciding how best to

11

represent a client"). On federal habeas review, this Court is mindful that "Strickland does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529, 534 (5th Cir. 2006). In other words, simply because counsel's strategy was not successful does not mean counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009).

Even if Mr. Nettles's failure to object did constitute deficient performance, Petitioner has nonetheless failed to show prejudice. To show prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Further, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. *See also Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) (finding an ineffective-assistance claim may be rejected for want of either deficient performance or prejudice, and thus the absence of either prong of the *Strickland* analysis is dispositive) (citation omitted).

Here, the trial court's jury charge instructed the jury that they could not "consider the testimony relating to any of the crimes, wrongs or acts unless you find and believe beyond a reasonable doubt that the defendant committed these acts, if any." Accordingly, the jurors knew they could not consider the extraneous offenses unless they believed beyond a reasonable doubt that Petitioner had committed them. Further, the state habeas court—who was the same judge as the convicting court—stated at the conclusion of the evidentiary hearing that, had Mr. Nettles requested the Article 38.37 hearing, the court would have decided that the jury could find the extraneous offenses to be provable beyond a reasonable doubt. As a result, this Court concludes that the state habeas court's application of *Strickland* was not unreasonable, and this claim is denied.

*2. Failure to secure the appearance of a favorable witness*

Petitioner's second claim argues that trial counsel was ineffective for failing to secure the appearance of Michael Cortez, a favorable witness for the defense. Petitioner argues that Mr. Nettles promised the jury during his opening statement that Mr. Cortez would testify, and that his failure to secure Mr. Cortez for trial led the jury to infer that Mr. Cortez was not called because his testimony would harm Petitioner's case.

The record shows that on May 2, 2017, the State applied for a subpoena of Mr. Cortez. However, there is no record that the State's subpoena was executed. (ECF No. 8-5 at 131.) On May 10, 2017, Mr. Nettles applied for a subpoena of Mr. Cortez (ECF No. 8-6 at 33.); personal service was attempted on May 11 but Mr. Cortez was not home; the subpoena was returned to the court on May 16 unexecuted. That same day, Mr. Nettles made his opening statement to the jury and said: "Michael Cortez will come in as a witness. He was a person who lived in this household in Pflugerville during this period of time and was involved in many of the things that [the complainant] is crying out about. I'll get into that, what the evidence will show." (ECF No. 8-15 at 79.) Later that day, the complainant testified that, when she was in the third grade, Petitioner grabbed her hand and made her touch his penis while they were playing hide-and-seek in a closet. She further testified that Mr. Cortez opened the doors to the closet, sent the complainant to another room, and then she heard what she believed was Mr. Cortez whipping the Petitioner with a belt. (ECF No. 8-15 at 109-11.)

In Mr. Nettles's first affidavit he gave the following reasons for why he did not secure Mr. Cortez as a witness:

> In preparation for trial there was reliance upon Defendant's family to secure witnesses. I went to the home of Defendant no fewer tha[n] 4 times and interviewed, among others, Michael Cortez. Notes indicate Michael Cortez was to

13

> testify about the animosity between Defendant's mother and her sister, who was
> [the complainant's] Mother. At trial as the evidence developed this theory of the
> case became less relevant with each witness called by the State. Michael Cortez
> was available as a witness however his testimony became less relevant. In fact, his
> testimony would have been about a defense theory, that had become untenable. The
> decision was made, after consultation with the Defendant not to call him as a
> witness.

(ECF No. 8-22 at 146-47.)

At the evidentiary hearing, Mr. Cortez testified that he never received a subpoena to testify

at the trial, and that, had he been subpoenaed, he would have testified he did not see anything

happen between Petitioner and the complainant in the closet, and that he did not discipline

Petitioner afterwards. (ECF No. 8-44 at 33-40.)

At the end of the hearing, the habeas court said that, with regard to Mr. Nettle's failure to

secure Mr. Cortez's appearance at trial,

> Mr. Cortez established that somebody from Mr. Nettles' office did reach out to
> him, spoke with him on the phone, and also Mr. Nettles himself spoke with him on
> the phone.  . . . [T]he Court will note that the day after Mr. Nettles was given Mr.
> Cortez's address, he issued a subpoena. Mr. Cortez further actually corroborated
> Brianna's testimony. He would have served the State better as a witness than the
> defense. Several defense witnesses testified and more would-be defense witnesses
> were prepared to testify that Brianna didn't have access to the house where she
> claimed the sexual assaults had occurred. Mr. Cortez would have contradicted
> those witnesses. He said he caught them, he caught the children playing hide and
> seek in the defendant's mother's closet. He was surprised. They were young. They
> were elementary school aged. He didn't think anything sexual was happening.
>
> And the fact that he didn't see anything sexual happening in the closet, I don't think
> —I think he would have corroborated Brianna's testimony that at one point she and
> the defendant were in a closet when many of the other defense witnesses absolutely
> disagreed that that ever could have been a remote possibility.

(*Id.* at 116.) The habeas court made the following findings of fact and conclusions of law:

> 35. On May 2, 2017, the State filed an application for subpoena, naming Michael
> Cortez as a witness.

39. On May 10, 2017, an application for a subpoena for Michael Cortez was issued by Mr. Nettles.

44. [Trial] began May 15, 2017.

45. During opening statements, Mr. Nettles stated: "Michael Cortez will come in as a witness. He was a person who lived in this household in Pflugerville during this period of time and was involved in many of the things that Brianna is crying about. I'll get into that, what the evidence will show."

46. During trial, Mr. Nettles communicated to Ms. Trammell, "Judge is not helping us. Brianna is good witness. Read Brady stuff I sent yesterday. Make sure Victoria sees it. Make sure Cortez is here."

48. Neither the State's subpoena nor the defense subpoena for testimony at the 2017 trial was served on Mr. Cortez.

49. Mr. Cortez did not appear to testify at trial.

50. At the evidentiary hearing, Mr. Cortez testified that he found the complaining witness and [Petitioner] playing in Ms. Trammell's closet, and that he told them to get out.

52. Mr. Cortez did not suspect any sexual activity was taking place in the closet, nor did he observe any signs of sexual activity.

53. Mr. Cortez denied the complaining witness's depiction in which she described Mr. Cortez [] whipping Applicant with a belt as consequence for discovering the children in the closet.

55. Mr. Cortez testified that he wasn't upset to find the children in the closet, but told them to get out because they were not supposed to be playing there.

56. Mr. Cortez testified that he would have provided this same testimony at trial if he had been subpoenaed to appear.

58. At trial, the defensive strategy was to offer a diagram of the duplex home and witness testimony to assert that the complaining witness was never in the side of the home with Ms. Trammell' s closet, to impeach the credibility of the complaining witness.

59. If Mr. Cortez had testified at trial, his testimony would have contradicted the testimony of other defensive witnesses.

15

60. This is consistent with Mr. Nettles's sworn statement, in which he explained that Mr. Cortez's testimony became less relevant as the trial proceeded, and that his testimony would have been about a defense theory that had become untenable.

61. This Court finds that even if Mr. Cortez had been duly subpoenaed, it would have been sound trial strategy to refrain from calling him as a witness and presenting contravening defensive strategies.

62. This Court finds that had Mr. Cortez testified at trial, his testimony would have undermined the prevailing defensive theory and would not have benefitted the defense.

63. This Court finds that Mr. Nettles's mentioning of Mr. Cortez during opening statement was minimal and did not create any expectation that resulted in harm when the promise of his testimony to the jury was not realized.

64. Applicant has failed to prove that failing to secure Mr. Cortez as a witness at trial fell below an objective standard of reasonableness.

65. Applicant has failed to prove that had Mr. Cortez's appearance at trial been secured, the outcome of the proceeding would likely have been different.

(ECF No. 8-22 at 176-80.)

To prevail on an ineffective-assistance-of-counsel claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Here, Mr. Cortez was named, habeas counsel demonstrated Mr. Cortez would have testified if he had been subpoenaed, and delineated the content of that testimony. However, the habeas court found that Mr. Cortez's testimony would not have been favorable to the defense: although he would have impeached one aspect of the complainant's testimony (i.e., that Petitioner made her touch his penis in the closet and Mr. Cortez punished him), he would have impeached other defense witnesses with testimony that placed the complainant in the closet, when other witnesses had testified she was never on that side of the home. The habeas court concluded it was a reasonable trial strategy

16

for Mr. Nettles not to call Mr. Cortez so as not to present conflicting testimony to the jury. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003) ("counsel has wide latitude in deciding how best to represent a client"); *Strickland*, 466 U.S. at 690 (counsel's choice of a defense and his strategy in arguing that defense to a jury are "virtually unchallengeable"); *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003) ("[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.")

Petitioner further argues that trial counsel was ineffective when he told the jury Mr. Cortez would testify in his opening statement but then failed to secure Mr. Cortez's appearance, thereby leading the jury to believe Mr. Cortez's testimony was harmful. As detailed above, the habeas court did conclude that Mr. Cortez's testimony was not favorable for the defense. However, the two cases Petitioner uses to support this claim are both out-of-circuit—and thus non-binding on this Court—and were decided years before the AEDPA was enacted in 1996.[4] Petitioner points to no Fifth Circuit case law holding that trial counsel is ineffective when counsel promises the jury they will hear from a particular witness but then fails to secure that witness's appearance. The habeas court found that Mr. Nettles's mention of Mr. Cortez during opening statement "did not create any expectation that resulted in harm" when Mr. Cortez did not appear. Under the "doubly deferential" standard imposed by the AEDPA and *Strickland*, the Court concludes the habeas court's denial of this claim was not unreasonable and this claim is denied.

### 3. Failure to investigate expert witnesses

In Petitioner's final claim he argues Mr. Nettles provided ineffective assistance when he failed to interview two expert witnesses and present their material, favorable testimony to the jury.

---

[4] *Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988); *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990).

Specifically, Petitioner argues that Mr. Nettles failed to interview Dr. F. Ada Ifesinachukwu and Dr. Carol Mitchum, both of whom treated Petitioner and his brother for mental health issues, and who were willing to testify in Petitioner's defense.

> In his first affidavit, Mr. Nettles responded as follows:

> I am uncertain as to the characterization made that I failed to interview these witnesses. It is my recollection that each of these witnesses was interviewed and it was determined their testimony was opinion testimony which was not admissible in the case in chief. In fact, the mental health witnesses had little testimony that would, in fact be probative on the issue of [Petitioner]'s credibility. Perhaps had [Petitioner] chosen to testify they could have been called to corroborate portions of his testimony.

(ECF No. 8-22 at 148.) In Nettles's supplemental affidavit, he further stated

> The State's primary expert, Dr. William Lee Carter had held up well regarding his observations regarding [Petitioner]'s behavior and obviously had been credible to the jury. In light of his testimony the testimony of Dr. [Ifesinachukwu], and Carol W. Mitchum, would be seen as not credible to the point of doing more harm than good. In fact at a previous setting Dr. [Ifesinachukwu] was made available to the prosecutor Mary Farrington and during that interview, attended by defense counsel it was decided her bias was so profound as to negate her testimony as a witness. She even went so far as to write a letter requesting dismissal of all charges.

(ECF No. 8-45 at 18-19.) Mary Farrington, an Assistant District Attorney in Travis County, submitted an affidavit before the state habeas court, where she stated:

> Early on in the case, Malcolm Nettles brought at least one, possibly two, mental health providers to court. Mr. Nettles introduced the mental health professional(s) to me, and we conducted a meeting. I took notes at that meeting and reviewed them before completing this affidavit. I believe the meeting took place in the jury room of the 299th District Court during a routine docket. I don't remember whether I spoke with Dr. Ada [Ifesinachukwu], Dr. Mitchum, or both, but I believe it was both, and both of their names are in my notes.

> During the course of the meeting, the mental health provider(s) told me that [Petitioner] could not have committed this crime, and that he was innocent. I have never had a mental health provider tell me that someone was innocent. The way she talked about [Petitioner] led me to believe that she had an incredible bias in his favor. She talked about him as if he wouldn't hurt anyone, and yet [Petitioner] had an Aggravated Robbery case and a history of domestic violence. . . .

18

The mental health provider(s) told me that [Petitioner] also does not have the capacity to lie. This did not make any sense because [Petitioner] had a prior case for tampering with identification numbers.

After the meeting, I am certain I spoke with Mr. Nettles and told him that in my opinion, the witness(es) were not credible and were extremely biased.

(ECF No. 8-22 at 167-68.)

At the evidentiary hearing, Dr. Ifesinachukwu testified that she was a psychiatrist, had been treating Petitioner since 2004, and had diagnosed him with, inter alia, autism spectrum disorder. She testified that she had never communicated with Mr. Nettles face-to-face, but had left him a telephone message and sent him a letter, telling Mr. Nettles she was willing to testify on Petitioner's behalf. On cross-examination, the State asked Dr. Ifesinachukwu if she was aware of Petitioner's conviction for aggravated robbery, to which she responded "No, I don't think he would aggravatedly rob some place." When the State said, "I'm not asking if you think it happened. I'm asking if you were aware," Dr. Ifesinachukwu replied "He's not—he's not that type of person." (ECF No. 8-44 at 58-67.)

Dr. Carol Mitchum also testified at the evidentiary hearing. She stated that she had a Ph. D. in counseling psychology and had been working with Petitioner for approximately eleven years. She also testified that she had spoken with Mr. Nettles approximately four times in a group setting; that she told him she felt the mental health piece was very important to the case, and that she expressed a willingness to testify on Petitioner's behalf. She stated that Mr. Nettles thought her testimony would not be productive since she had not been working with Petitioner for the entire timeline of the complainant's outcry. (ECF No. 8-44 at 68-74.)

At the end of the evidentiary hearing, the habeas court stated

With respect to the evidence from the doctors, I think during cross-examination, I think that having heard both the testimony of Dr. Ada [Ifesinachukwu] and Dr.

Mitchum, I think the prosecutor's feeling that they would not have been perceived of neutral objective witnesses is absolutely true with respect particularly to Dr. Ada [Ifesinachukwu]. I find her testimony completely incredible. I mean, I—overseeing [Petitioner] on this aggravated robbery that he's pled guilty to and, you know, under oath she denied that he could have done that, they were not neutral mental health experts. They were people very tied to the family. They were advocates on behalf of both of the children and with—and Devin [Petitioner's brother] himself testified. So whatever they would say about what Devin could or couldn't have done or couldn't have seen, he testified and was subject to cross-examination. So I think that their testimony would not have been helpful.

(*Id.* at 116-17.) The court made the following findings in recommending denial of this claim:

79. Dr. Mitchum spoke with Mr. Nettles approximately four times, in a group setting each time.

80. Dr. Mitchum felt the mental health information she could testify to about Applicant was very significant for the case.

81. Dr. Mitchum testified that Mr. Nettles informed her that her testimony would not be productive since she did not actually witness any of the events alleged at trial.

82. Applicant's claim that his attorney failed to interview Dr. Mitchum is without merit.

83. Dr. Mitchum met with Assistant District Attorney Mary Farrington prior to trial.

84. ADA Farrington found Dr. Mitchum to be extremely biased and not credible in that meeting.

85. ADA Farrington communicated to Mr. Nettles that she found Dr. Mitchum to be extremely biased and would not be credible as a witness.

90. This Court finds that Dr. Mitchum was an advocate, rather than a neutral expert witness.

91. This Court finds that Dr. Ada Ifesinachukwu was an advocate, rather than a neutral expert witness.

92. This Court finds that any testimony about what Applicant's brother was capable of communicating was irrelevant because Applicant's brother testified and his capacity to communicate was apparent for the jury during testimony and cross-examination.

93. Applicant has failed to show how the testimony of either Dr. Mitchum or Dr. Ada Ifesinachukwu would have been relevant to the guilt or innocence phase of the trial, or in what manner their testimony would have benefitted the defense.

94. Applicant has failed to show that any failure to interview Dr. Ada Ifesinachukwu fell below an objective standard of reasonableness.

95. Applicant has failed to show that the outcome would likely had been different if his attorney had interviewed Dr. Ada Ifesinachukwu. Applicant has failed to show his attorney rendered ineffective assistance of counsel for failing to utilize either Dr. Ada Ifesinachukwu or Dr. Mitchum as a witness.

(ECF No. 8-22 at 180-84.)

As discussed in the prior section, to establish ineffective assistance of counsel based on a failure to call witnesses, Petitioner has to show, inter alia, that the witness's testimony would have been favorable to the defense. *Day*, 566 F.3d at 538.The state habeas court found that the testimony of Dr. Ifesinachukwu and Dr. Mitchum would not have been favorable because they were not neutral experts but rather family advocates. Based on its review of the record, this Court concludes that the state habeas court's application of *Strickland* was not unreasonable, and this claim is denied.

### IV. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable

21

jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the Court will not issue a certificate of appealability.

It is therefore **ORDERED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) is **DENIED**; and

It is **FURTHER ORDERED** that no certificate of appealability shall issue in this case.


SIGNED this 27th day of October, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE